In re Estate of Louis HENSARLING, Deceased.

No. 1292.

Court of Civil Appeals of Texas, Tyler.

Nov. 15, 1979.

Paul Tatum, Holt, Tatum & McCarver, Nacogdoches, for appellant.

Billy J. Earley, McWhorter & Earley, Nacogdoches, for appellee.

McKAY, Justice.

This is a will contest.

Appellant, Raymond D. Hensarling, filed an application to probate the will of his father, Louis Hensarling, such will having been executed on September 3, 1974. Appellee Reba Hensarling, surviving spouse of the testator, filed an opposition to the application to probate, and, at the same time, filed application to probate a prior will of the testator, which had been executed on June 7, 1963. Appellee alleged that on September 3, 1974, Louis Hensarling did not have testamentary capacity to make a valid will, and that he was then acting under undue influence of his daughter, Odessa Mechell.

Trial was had before a jury. In response to special issue No. 1 the jury found that Louis Hensarling did not have testamentary capacity when the will of September 3, 1974, was executed. By its answer to issue No. 2 the jury found that when Louis Hensarling executed the will dated September 3, 1974, he was acting under the undue influence of Odessa Mechell. Based upon the jury verdict the trial court admitted the first will dated June 7, 1963, to probate.

Appellant's points of error attack the verdict of the jury on evidentiary grounds—that there was no evidence, insufficient evidence, and that the verdict on both issues was contrary to the greater weight and degree of credible testimony. In considering appellant's contention that there was no evidence to support the jury's findings we may consider only the evidence and inferences in support of the jury's findings, while disregarding all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In examining the factual sufficiency of the evidence to support the jury's findings we must consider the whole record to determine whether such findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The witness Betty Simpson testified that she was raised by Louis Hensarling and his wife Reba from the time she was seven years of age; that from 1973 to 1975 she spent every weekend with them as well as when she had days off from work; that she drove Louis to places; and that she had opportunity to observe him. She further testified that in her opinion he did not have sufficient ability to understand the natural objects of his bounty—that he was like a baby, and that he could not understand the nature of his estate or the property that he owned nor what he would have wanted done with it; that he did not have sufficient memory to collect in his mind elements of any business to be transacted and to retain them long enough to perceive their obvious relationship to each other to form reasonable judgment as to that business.

David Tomkins, who worked with Louis Hensarling about twelve years and knew him very well, testified that after Louis had the stroke he visited him in the hospital and then about once per week after he went home; that Louis did not know all his family, and that he would not have known how to handle business transactions.

The witness Howard Holt, a brother-in-law of deceased who lived across the street, testified that he saw and talked to Louis nearly every day after his stroke, and that Louis had difficulty talking and remembering things almost every time he talked with him. He further testified that in his opinion Louis would not know the natural objects of his bounty, nor his family, he could not concentrate on business transactions well enough to know what he was doing, and he would not have known nor understood the nature of his estate.

Iva Wallace, who was a friend and neighbor and had known the deceased for thirteen years, testified that the deceased's stroke changed his character and mood so much that he was not able to carry on a conversation for an extended period, and at times he did not know her or her husband. She further said that in her opinion he did not know, nor had the capacity to know, his family and those close to him, and in her opinion he would not have known the nature of a business transaction and could not "have carried them forward long enough in his mind to have known that which he was engaged." She also testified that he did not know the nature and extent of his estate.

A Licensed Vocational Nurse (LVN) employed by a medical doctor, Jewell Gill, testified she knew the deceased many years before he had the stroke, and that after the stroke she visited him to take his blood pressure every few days and stayed 45 minutes to an hour each time. She said the deceased could not carry on a conversation, that he would "go off in a daze," and he had difficulty in remembering anything. She further testified that in her opinion in September, 1974, he did not have the ability to know and understand the natural objects of his bounty, did not know his family and those close to him, did not have the ability to know his business transactions, would not have been able to have formulated a plan and carried it out, and did not know the nature or extent of his estate.

Lionel Hughes of Longview, a brother-in-law of deceased who was business manager of a Mental Health and Mental Retardation Center at Longview, testified he prepared deceased's tax returns and visited him once a month. He testified deceased had difficulty carrying on a conversation, was forgetful and could not remember things. He further said in his opinion it would be doubtful whether Louis would have known the natural objects of his bounty and their claims upon him; that he would not have understood the nature of a business transaction in which he was engaged since he could not have concentrated upon or remembered how to proceed to carry out a plan; and that at times he would have understood the nature and extend of his estate and at other times he would not have done so.

Dr. Charles W. Coussons testified the deceased had been his patient since 1970 or 1971, and that he had symptoms of vertigo and dizziness associated with cerebral vascular insufficiency; that the deceased was hospitalized in 1972 with the same complaint plus an ulcer; that he had a stroke on April 25, 1973, which required hospitalization for nine days, and caused speech defects and mental confusion for several days; and that he was hospitalized in May, 1974, with jaundice and nausea. Dr. Coussons also testified that in his opinion the deceased would have known his family and his children and what property he owned.

Garth Laten, who knew Louis Hensarling and worked with him for several years, testified he visited with Louis several times after he suffered a stroke, and that Louis had no trouble carrying on a conversation and that in his opinion he knew who his friends, his heirs and his children were, and the nature and extent of his property. He further said in his opinion Louis would be able to carry on a business transaction.

Ralph Jernagen testified he knew Louis Hensarling, sold auto parts to him for several years, and saw him about once a month after his stroke. He testified that he never had trouble carrying on a conversation with Louis, that Louis could carry on business, that he drove his car, and that in his opinion Louis would know who his children and heirs were and the nature and extent of his property.

■ It is our opinion that there is ample evidence in the record to support the finding of the jury to issue 1 that Louis Hensarling did not have testamentary capacity at the time he signed the will of September 3, 1974.

■ Appellant argues that the testimony of the expert witness should be given more weight and credibility on the issue of mental capacity than that of lay witnesses. It is the province of the jury to judge the credibility of the witnesses and the weight to be given their testimony, *Ford v. Panhandle & Santa Fe Ry. Co.*, 151 Tex. 538, 252 S.W.2d 561, 563 (1952), and this is generally true of expert witnesses as well as ordinary lay witnesses. 1 Texas Practice, Evidence, McCormick and Ray, Sec. 3, p. 6; *Clark v. Memorial Hospital*, 551 S.W.2d 469, 472 (Tex.Civ.App.—Tyler 1977, no writ).

■ Having found that the evidence is sufficient to support the finding ·on the question of testamentary capacity, the answer to issue 2 becomes immaterial because mental capacity and undue influence are two distinct grounds for avoiding a will, and "Undue influence in its essential elements has no real relation to mental incapacity." *Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034, 1036 (1939). Stated another way, mental capacity must be shown to exist before the question of undue influence would arise. Id. Testamentary incapacity implies a lack of intelligent mental power, while undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963).

Judgment of the trial court is affirmed.